Debra HALL, Individually and on Behalf of All Others Similarly Situated, Plaintiffs,

v.

THE CHILDREN'S PLACE RETAIL STORES, INC., Ezra Dabah & Susan Riley, Defendants.

No. 07 Civ. 8252(SAS).

United States District Court, S.D. New York.

July 18, 2008.

Samuel H. Rudman, Esq., David A. Rosenfeld, Esq., Mario Alba, Jr., Esq., Coughlin Stoia Geller Rudman & Robbins LLP, Melville, NY, Nathan M. Jenkins, Esq., Jenkins & Carter, Reno, NV, for Lead Plaintiff and the Class.

Jonathan D. Polkes, Esq., David R. Fertig, Esq., Weil, Gotshal & Manges LLP, Robert J. Jossen, Esq., Michael J. Gilbert, Esq., Dechert LLP, Richard P. Swanson, Esq., Arnold & Porter LLP, New York, NY, for Defendants.

### *OPINION AND ORDER*

SHIRA A. SCHEINDLIN, District Judge.

This putative class action is brought on behalf of a class of shareholders of The Children's Place Retail Stores, Inc. ("TCP" or the "Company") against (1) TCP; (2) its Chief Executive Officer ("CEO"), Ezra Dabah; and (3) its Chief Financial Officer ("CFO"), Susan Riley. Debra Hall and all other similarly situated shareholders (the "Shareholders") allege in the Consolidated Class Action Complaint (the "Complaint") that defendants violated federal securities laws in connection with the Company's accounting for stock options in its financial statements and its certifications of the adequacy of the Company's internal controls. Plaintiffs further assert that the defendants fraudulently misstated the Company's financial statements by reporting artificially inflated financial results, failing to disclose significant problems with a major business partner, and knowingly violating the Company's internal control policies. The defendants now move to dismiss the Complaint. For the reasons discussed below, the motion is denied.

## I. BACKGROUND

### A. Facts[1]

During the period from March 9, 2006 through August 23, 2007 (the "Class Period"), TCP operated as a specialty retail company.[2] Throughout the Class Period, the Company was registered with the Securities and Exchange Commission ("SEC") pursuant to the Securities Ex-

---

1. The facts summarized in this section are drawn from the Complaint ("Compl.") and are presumed to be true for the purpose of these motions.

2. *See* Compl. ¶ 16.

change Act of 1934 ("Exchange Act") and was traded on the NASDAQ National Market ("NASDAQ").[3] Dabah served as CEO of TCP throughout the Class Period.[4] Riley served as Senior Vice President and CFO of TCP from April 2006 until January 2007 and has been Executive Vice President of Finance and Administration of TCP since January 2007.[5]

### 1. The Disney Stores Acquisition

In 2004, TCP entered into a License and Conduct of Business Agreement ("License Agreement") with the Walt Disney Company ("Disney") that provided TCP with the exclusive right to operate the Disney Store North America, a total of 313 retail operations (the "Disney Stores").[6] Pursuant to the License Agreement and in exchange for the sum of $101 million, TCP acquired the Disney Stores which sell Disney-related merchandise in malls and shopping centers throughout the country.[7] Under the License Agreement, TCP was obligated to maintain the "quality, appearance and presentation standards" of the Disney Stores.[8] In April of 2006, the License Agreement was amended, requiring TCP to: (1) completely remodel each Disney Store within a specified time after lease renewals; (2) completely remodel each Disney Store at least once every twelve years; and (3) completely remodel a minimum of 160 of the 313 acquired Disney Stores by January 1, 2009 ("Remodeling Initiative").[9] The Disney Franchise Board

("Franchise Board") regularly interacted with TCP and its subsidiary, Hoop, to ensure that the company complied with all terms of the License Agreement.[10]

Seven confidential witnesses ("CW 1–7") have provided relevant information about the procedures and practices carried out by the Company during the Class Period.[11] Each CW was either an employee of the Company or worked closely with the Company, providing them with access to the information they have alleged in the Complaint.[12] According to CW 4, a long-time Disney Stores employee, the Franchise Board approval process was an integral element of the License Agreement.[13] Following the signing of the License Agreement and during the Class Period, TCP experienced ongoing problems and delays in developing merchandise to sell in the Disney Stores and in carrying out the Remodeling Initiative.[14] According to CW 1, the Franchise Board frequently disapproved of the manner in which TCP was carrying out the design and remodeling of the Disney Stores, as well as the development and selection of Disney merchandise under the License Agreement.[15] "According to CW 5, many of Dabah's decisions created problems for Hoop ... because Dabah disregarded the desires and expectations of Disney, as set forth in the License Agreement and communicated by the Franchise Board." [16]

---

**3.** *See id.* ¶ 21.

**4.** *See id.* 117.

**5.** *See id.*

**6.** *See id.* ¶ 11.

**7.** *See id.* ¶ 6.

**8.** *See id.* ¶ 13.

**9.** *See id.* ¶ 15.

**10.** *See id.*

**11.** *See id.* ¶ 29.

**12.** *See id.*

**13.** *See id.* ¶ 43.

**14.** *See id.* ¶ 44.

**15.** *See id.* ¶ 45.

**16.** *id.* ¶ 46.

During the Class Period, TCP regularly represented that its relationship with Disney was a positive one and that it was working closely with Disney to carry out the Remodeling Initiative.[17] However, according to CW 1, the Franchise Board continuously disapproved of store and merchandise designs, particularly relating to one "design theme" known as the Mickey Store format.[18] Fifty existing Disney Stores were scheduled to be remodeled to the Mickey Store Format within the first calendar year after the acquisition.[19] CW 2 confirmed that "Hoop executives regularly 'butted heads' with representatives of the Franchise Board."[20] Moreover, according to CW 5, Hoop did not conduct any maintenance or repair on any of the stores as required by the License Agreement.[21] At all times, TCP was aware of the problems Hoop was experiencing.[22] As of February 3, 2007, TCP had only remodeled thirty-two of the approximately 145 stores. As a result of its failure to meet certain deadlines and other violations of the License Agreement, TCP was "in breach of the License Agreement throughout 2006 and most of 2007."[23] In 2007, Disney notified TCP that it had committed one hundred and twenty breaches of the License Agreement.[24] As a consequence, TCP and Disney entered into a letter agreement (the "June Letter Agreement")

that imposed new obligations on TCP.[25] In August 2007, TCP disclosed that it had fallen behind on its obligations under the June Letter Agreement and would likely miss upcoming deadlines.[26] As a result of the violation, Disney was free to terminate the License Agreement.[27]

## 2. TCP's Stock Option Grants and Financial Statements

TCP granted stock options to its officers, directors, and employees pursuant to at least two stock option plans.[28] From 1997 through 2005, TCP engaged in the improper practice of backdating these stock options.[29] Stock option backdating involves intentionally altering the stock option grant dates to an earlier date when the stock's price was lower.[30] A key purpose of stock options is to give recipients an incentive to improve their employer's performance, including its stock price.[31] Backdating them so they carry a lower exercise, or strike, price gives the recipient a "paper profit" right from the start.[32] The difference between the stock's current market price and the option's exercise price represents the amount of profit per share gained upon the exercise or the sale of the option.[33] For example, if a company grants options on May 22, when the stock's market price is twenty dollars, but records the grant date as April 22, when its mar-

17. *See id.* ¶ 47.

18. *See id.*

19. *See id.* ¶ 51.

20. *Id.* ¶ 47.

21. *See id.* ¶ 49.

22. *See id.* ¶ 50.

23. *Id.* ¶ 58.

24. *See id.* ¶ 59.

25. *See id.* ¶ 60.

26. *See id.* ¶ 62.

27. *See id.*

28. *See id.* ¶ 64.

29. *See id.* ¶ 63.

30. *See id.*

31. *See id.*

32. *See id.*

33. *See id.*

ket price was only fifteen dollars, the intrinsic value of the option would be the difference between its market price on May 22 and its strike price on April 22—five dollars.[34]

The Company's 2005 Form 10–K, filed with the SEC on or about April 12, 2006, falsely represented that the Company applied Accounting Principles Board No. 25, "Accounting for Stock Issued to Employees" ("APB 25") to its stock option grants.[35] The provisions of APB 25 mandate use of the intrinsic value method which determines an asset's true value regardless of its market price.[36] The 2005 Form 10–K stated that TCP uses the intrinsic value method under APB 25 to account for its stock option plans.[37] The Company has since disclosed that its APB 25 measurement dates were incorrect. The options were backdated, many times just before a sharp increase in the trading price of TCP stock, *i.e.*, the options were spring-loaded.[38] Spring-loaded options are granted immediately preceding a company announcement that is expected to have a positive result on the stock price.[39] The value of the options is spring-loaded because after they are granted there is a high likelihood that the options will be "in the money," *i.e.*, the market price will be above the strike price.[40] Because positive news typically causes the market price of a company's stock to surge in value, timing an option grant to precede the public news release will allow the recipient to receive

an immediate paper profit.[41] "Defendants have now admitted that certain option grant dates were set with a view towards upcoming disclosures."[42] TCP has now disclosed that "as a result of the Company's governance, internal financial reporting and other controls over the option grant process, the APB 25 measurement dates used by the Company for a significant portion of the stock options granted during the Review Period were incorrect."[43] The Company further represented that "[o]ptions granted under the [Stock Option] Plans have exercise prices established by the Compensation Committee [which] provided that the exercise price of incentive stock options may not be less than the fair market value of the underlying shares at the date of grant."[44] This statement, and all related statements, are materially false and misleading because TCP granted stock options to insiders at exercise prices that were below their fair market value on the grant date.[45] The options backdating scheme caused TCP's 2005 Form 10–K to materially understate the Company's compensation expense and overstate the Company's net income and earnings per share.[46] This was a violation of Generally Accepted Accounting Principles ("GAAP") standards, conventions and rules of financial accounting. TCP has restated its historical financial statements to record charges for compensation expenses. The Company stated that its "previously issued financial state-

---

34. *See id.*

35. *See id.* ¶ 67.

36. *Id.*

37. *See id.* ¶ 70.

38. *See id.* ¶ 68.

39. *See id.*

40. *See id.*

41. *See id.*

42. *Id.*

43. *Id.* ¶ 69 (quoting 2007 Form 10–K).

44. *Id.* ¶ 66.

45. *See id.*

46. *See id.* ¶¶ 70–72.

ments and other historical financial information and related disclosures for periods through the first quarter of fiscal should no longer be relied upon." [47]

### 3. Internal Controls

The Shareholders allege that, throughout the Class Period, TCP suffered from internal control deficiencies.[48] Plaintiffs allege that Dabah admittedly violated the Company's internal control policies by pledging shares of his common stock as collateral for margin loans in his brokerage account during a black-out period.[49] Plaintiffs contend that this pledge amounted to a clandestine sale of stock and provided Dabah with a motive to conceal problems at the Company—to prevent a decrease in the price of TCP stock that might generate a margin call or a decrease in the amount of margin Dabah could borrow.[50]

Furthermore, as discussed above, incorrect APB 25 measurement dates were used to backdate stock options and materially misstate financial statements. Nevertheless, Dabah and Riley repeatedly issued sworn Sarbanes–Oxley certifications attesting to the adequacy of the Company's internal controls.[51] Specifically, on April 12, 2006, Dabah attested in the Company's Form 10–K that TCP possessed adequate internal controls.[52] Dabah and Riley also signed the Company's Forms 10–Q, which stated that the Company's disclosure controls and procedures were effective.[53] The Shareholders allege that the certifications

were materially false and misleading when made because TCP did not maintain appropriate internal controls.[54]

### B. Procedural History

On September 21, 2007, Debra Hall filed a complaint against TCP, Dabah, and Riley. Laborers Pension Trust Fund for Northern Nevada ("LPTF") moved to serve as Lead Plaintiff, and on December 17, 2007, the Court consolidated this action and appointed LPTF as Lead Plaintiff for the Class. The Consolidated Amended Class Action Complaint was filed on February 28, 2008.

## II. LEGAL STANDARD

### A. Motion to Dismiss

When deciding a motion to dismiss under Rule 12(b)(6), the court must "accept as true all of the factual allegations contained in the complaint"[55] and "draw all inferences in the light most favorable to the non-moving party[ ]."[56] Nevertheless, the court need not accord "[l]egal conclusions, deductions or opinions couched as factual allegations ... a presumption of truthfulness."[57]

In deciding a motion to dismiss, the court is not limited to the face of the complaint. The court "may [also] consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure docu-

---

47. *Id.* ¶ 73 (quoting 10/5/06 TCP press release).

48. *See id.* ¶ 79.

49. *See id.* ¶ 8.

50. *See id.*

51. *See id.* ¶ 78.

52. *See id.* ¶ 76.

53. *See id.* ¶ 77.

54. *See id.* ¶ 79.

55. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007). *Accord In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir.2007).

56. *In re NYSE Specialists*, 503 F.3d at 95.

57. *Id.* (quotation omitted).

ments filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." [58]

### 1. Pleading Requirements

"Federal Rule of Civil Procedure 8(a)(2) requires ... 'a short and plain statement of the claim showing that the pleader is entitled to relief.' " [59] To survive a 12(b)(6) motion to dismiss, the allegations in the complaint must meet the standard of "plausibility." [60] Although the complaint need not provide "detailed factual allegations," [61] it must "amplify a claim with some factual allegations ... to render the claim *plausible.*"[62] The standard is no longer that a complaint can be dismissed only if there us "no set of facts" that plaintiff could prove "which would entitle him to relief." [63] Rather, the complaint must provide "the grounds upon which [the plaintiff's] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " [64]

### 2. Securities Fraud

■ "Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." [65] Those heightened pleading requirements are imposed by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (the "PSLRA").[66] "Private securities fraud actions must also meet the PSLRA's pleading requirements or face dismissal." [67]

#### a. Rule 9(b)

■ A complaint alleging securities fraud must satisfy Rule 9(b)'s requirement that "the circumstances constituting fraud ... be stated with particularity." [68] "This pleading constraint serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits." [69] To comply with the requirements of Rule 9(b), a plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." [70] "Allegations that are conclusory or unsupported by factual assertions are insufficient." [71]

**58.** *ATSI Commc'ns v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007).

**59.** *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (quoting Fed.R.Civ.P. 8(a)(2)).

**60**: *See Bell Atl.,* 127 S.Ct. at 1970.

**61.** *Id.* at 1964. *Accord ATSI,* 493 F.3d at 98 n. 2 (applying the standard of plausibility outside *Twombly's* anti-trust context).

**62.** *Iqbal v. Hasty,* 490 F.3d 143, 157–58 (2d Cir.2007) (emphasis in original).

**63.** *Bell Atl.,* 127 S.Ct. at 1969 (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). *Accord id.* ("The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard ....").

**64.** *ATSI,* 493 F.3d at 98 (quoting *Bell Atl.,* 127 S.Ct. at 1965).

**65.** *Id.* at 99.

**66.** *See* 15 U.S.C. § 78u–4(b).

**67.** *ATSI,* 493 F.3d at 99 (citing 15 U.S.C. § 78u–4(b)(3)(A)).

**68.** Fed.R.Civ.P. 9(b). *Accord ATSI,* 493 F.3d at 99.

**69.** *ATSI,* 493 F.3d at 99 (citing *Rombach v. Chang,* 355 F.3d 164, 171 (2d Cir.2004)).

**70.** *Rombach,* 355 F.3d at 170 (quotation omitted). *Accord ATSI,* 493 F.3d at 99 (citing *Novak v. Kasaks,* 216 F.3d 300, 306 (2d Cir. 2000)).

**71.** *ATSI,* 493 F.3d at 99.

## b. The PSLRA

 The PSLRA requires plaintiffs to state with particularity "both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate, or defraud." [72] The PSLRA specifies that the plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." [73] The Supreme Court recently clarified the strong inference of scienter requirement in *Tellabs Inc. v. Makor Issues & Rights, Ltd.* There, the Court held that in order to determine whether scienter is adequately pled, courts must look at the complaint as a whole and "must take into account plausible opposing inferences." [74] "[A]n inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." [75] The inference need not, however, be "irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences." [76] The inquiry on a motion to dismiss is as follows: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" [77] "If the plaintiff alleges a false statement or omission, the PSLRA also requires that 'the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.' " [78]

## B. Exchange Act Violations

### 1. Section 10(b) and Rule 10b–5

 In order to state a claim under Rule 10b–5 for misrepresentations, the "plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." [79] With respect to the first element, the complaint must "state with particularity the specific facts in support of [plaintiffs'] belief that [defendants'] statements were false when made." [80] "Corporate officials need not be

72. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S.Ct. 2499, 2504, 168 L.Ed.2d 179 (2007) (quotation omitted) (citing 15 U.S.C. § 78u–4(b) (*l* ), (2)).

73. *Id.* (quoting 15 U.S.C. § 78u–4(b)(2)).

74. *Id.* at 2509. These plausible opposing inferences, however, may be based only on the complaint and other public documents on which Courts ordinarily rely in deciding a motion to dismiss, "while constantly assuming the plaintiff's allegations to be true." *Id.* at 2509, 2511–12.

75. *Id.* at 2504–05.

76. *Id.* at 2510 (citation omitted).

77. *Id.* at 2511. *Accord id.* at 2510 ("A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.").

78. *ATSI*, 493 F.3d at 99 (quoting 15 U.S.C. § 78u–4(b)(*l* )).

79. *Id.* at 105 (affirming the dismissal of plaintiffs' misrepresentations claims) (citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir.2005)).

80. *Rombach*, 355 F.3d at 172 (quotation omitted). *Accord In re Vivendi Universal, S.A. Sec. Litig.*, 381 F.Supp.2d 158, 182 (S.D.N.Y.2003) (holding that statements that a company was "financially solid" were actionable where defendants did not have a reasonable basis for them); *In re Oxford Health*, 187 F.R.D. 133, 140 (S.D.N.Y.1999) (holding that statements downplaying internal control problems were actionable because they misled investors into believing the problems were not as serious or extensive as they were).

clairvoyant; they are only responsible for revealing those material facts reasonably available to them."[81] Once defendants choose to speak about their company, they undertake a duty "to speak truthfully and to make such additional disclosures as ... necessary to avoid rendering the statements misleading."[82] In situations "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."[83] Mere "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."[84]

▬▬▬ Certain statements are protected by the PSLRA's safe harbor provision and the bespeaks caution doctrine. Under the PSLRA's safe harbor provision, forward-looking statements are deemed immaterial and non-actionable when they are accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements."[85] However statements are not protected where defendants "had no basis for their optimistic statements and already knew (allegedly) that certain risks had become reality."[86] Similarly, under the judicially created bespeaks caution doctrine, "alleged misrepresentations ... are deemed immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language...."[87] Under the "truth-on-the-market" doctrine, information already known on the market is also immaterial.[88] Statements may also be deemed immaterial as merely vague expressions of optimism or puffery.[89] Lastly, pleadings

**81.** *Novak*, 216 F.3d at 308 (citation omitted).

**82.** *In re Par Pharm., Inc. Sec. Litig.*, 733 F.Supp. 668, 675 (S.D.N.Y.1990). *Accord In re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir.1993) (holding that "[a] duty to disclose arises whenever secret information renders prior public statements materially misleading"); *Lapin v. Goldman Sachs Group, Inc.*, 506 F.Supp.2d 221, 237 (S.D.N.Y.2006) (holding that "upon choosing to speak one 'has a duty to be both accurate and complete' ") (quoting *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir.2002)); *In re Alstom SA Sec. Litig.*, 406 F.Supp.2d 433 (S.D.N.Y.2005) ("[O]mission is actionable when the failure to disclose renders a statement misleading.").

**83.** *Novak*, 216 F.3d at 309 (citation omitted).

**84.** *Id.* (citation omitted). *Accord Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir.2000) ("The fact that management's optimism about a prosperous future turned out to be unwarranted is not circumstantial evidence of conscious fraudulent behavior or recklessness: People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage." (quotations omitted)).

**85.** 15 U.S.C. § 78u–5(c)(1)(A).

**86.** *In re Nortel Networks Corp. Sec. Litig.*, 238 F.Supp.2d 613, 629 (S.D.N.Y.2003). *Accord Gabriel Capital, L.P. v. NatWest Fin., Inc.*, 122 F.Supp.2d 407, 419 (S.D.N.Y.2000) (observing that the bespeaks caution doctrine "does not apply where a defendant knew that its statement was false when made").

**87.** *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir.2002).

**88.** *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 159 (2d Cir.2000) ("The truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality.").

**89.** *See In re NTL, Inc. Sec. Litig.*, 347 F.Supp.2d 15, 34 (S.D.N.Y.2004) ("Vague expressions of optimism, or puffery, are insufficient to support a claim for securities fraud.").

based on fraud by hindsight are not actionable as a matter of law.[90]

 Scienter can be pled by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."[91] "Sufficient motive allegations entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged."[92] "[A]dmissions of misrepresentations, coupled with defendants' continuous intimate knowledge of company affairs is enough to adequately infer scienter."[93] Moreover, "[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud."[94] "To prove liability against a corporation . . . a plaintiff must prove that an agent of the corporation committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to the corporation."[95]

 "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater."[96] Under this theory of scienter, a plaintiff must show that the defendant's conduct is "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."[97] "Under certain circumstances, [courts] have found allegations of recklessness to be sufficient where plaintiffs alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud."[98] Reck-

90. *See Caiafa v. Sea Containers, Ltd.,* 525 F.Supp.2d 398, 410–411 (S.D.N.Y.2007).

91. *ATSI,* 493 F.3d at 99 (citing *Ganino,* 228 F.3d at 168–69). *Accord In re Scottish Re Group Sec. Litig.,* 524 F.Supp.2d 370, 398 (S.D.N.Y.2007) (holding that plaintiffs adequately pleaded scienter because the allegations supported the inference that the company and the officers were at least reckless in not knowing that the financial statements were false and in failing to disclose internal control weaknesses); *In re eSpeed, Inc. Sec. Litig.,* 457 F.Supp.2d 266, 292 (S.D.N.Y.2006) (holding that plaintiffs must "specifically allege defendants' knowledge of facts or access to information contradicting their public statements").

92. *Kalnit v. Eichler,* 264 F.3d 131, 139 (2d Cir.2001) (describing "[i]nsufficient motives" as including "(1) the desire for the corporation to appear profitable and (2) the desire to keep stock prices high to increase officer compensation") (quotations omitted).

93. *Stevelman v. Alias Res. Inc.,* 174 F.3d 79, 84–85 (2d Cir.1999).

94. *Kalnit,* 264 F.3d at 139. *Accord In re Openwave Sys. Sec. Litig.,* 528 F.Supp.2d 236, 250 (S.D.N.Y.2007) (holding that defendants' stock options "are 'concrete and personal' because they represent a species of compensation different from the one ordinarily accumulated by corporate officers and directors"); *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 939 (2d Cir.1984) (holding that "a pledge is a sale and purchase of a security under § 10(b)").

95. *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,* 531 F.3d 190, 195 (S.D.N.Y.2008).

96. *Kalnit,* 264 F.3d at 142.

97. *Id.* (quotation omitted).

98. *Novak,* 216 F.3d at 308. *Accord In re Veeco Instruments, Inc., Sec. Litig.,* 235 F.R.D. 220, 232 (S.D.N.Y.2006) (holding that the scienter requirement was satisfied by identification of specific facts constituting strong circumstantial evidence of recklessness and allegations that defendants knew of or recklessly ignored a series of accounting improprieties).

lessness can be shown by "defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation."[99]

 Finally, in order to state a claim for securities fraud, a plaintiff must plead "both transaction causation (also known as reliance) and loss causation."[100] Transaction causation requires a plaintiff to demonstrate that " 'but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.' "[101] Loss causation is "the proximate causal link between the alleged misconduct and the plaintiff's economic harm."[102] "To that end, the plaintiff's complaint must plead that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement."[103]

### 2. Control Person Liability: Section 20(a)

 In order to plead a prima facie case of control person liability under section 20(a), a plaintiff must allege "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's

fraud."[104] "Allegations of control are not averments of fraud and therefore need not be pleaded with particularity."[105] Thus, " '[a]t the pleading stage, the extent to which the control must be alleged will be governed by Rule 8's pleading standard' " and " '[a]short, plain statement that gives the defendant fair notice of the claim that the defendant was a control person and the ground on which it rests its assertion that a defendant was a control person is all that is required.' "[106]

## III. DISCUSSION

### A. Section 10(b) and Rule 10b–5

### 1. Falsity

Plaintiffs assert that Dabah and Riley made material misstatements and omissions by reporting artificially inflated financial results, failing to disclose significant problems with the Disney Stores and violating the Company's internal control policies.[107] Plaintiffs further allege that Dabah and Riley's certifications regarding internal controls were fraudulent.[108] Defendants move to dismiss the section 10(b) and Rule 10b–5 claims on the ground that plaintiffs have failed to plead any false or misleading statement with the particularity required by Rule 9(b) and the PSLRA. Defendants assert that plaintiffs, looking backward in time, have seized on minor business delays, articulating a "fraud by hindsight" pleading—prohibited by this

**99.** *Novak,* 216 F.3d at 308.

**100.** *ATSI,* 493 F.3d at 106.

**101.** *Id.* (quoting *Lentell,* 396 F.3d at 172).

**102.** *Id.* at 106–07 (citing *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 346, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005); *Lentell,* 396 F.3d at 172). *Accord Emergent Capital Inv. Mgmt. v. Stonepath Group, LLC,* 343 F.3d 189, 197 (2d Cir.2003).

**103.** *ATSI,* 493 F.3d at 107 (citing *Lentell,* 396 F.3d at 173).

**104.** *Id.* at 108.

**105.** *In re Parmalat Sec. Litig.,* 414 F.Supp.2d 428, 440 (S.D.N.Y.2006).

**106.** *In re Scottish Re Group,* 524 F.Supp.2d at 385. *Accord In re Converium Holding AG Sec. Litig.,* No. 04 Civ. 7897, 2006 WL 3804619, at *14 (S.D.N.Y. Dec. 28, 2006) (quoting *In re WorldCom, Inc. Sec. Litig.,* 294 F.Supp.2d 392, 415–16 (S.D.N.Y.2003)).

**107.** *See* Compl. ¶ 4.

**108.** *See id.*

Circuit.[109] However, as discussed below, plaintiffs have specified fraudulent statements, identified the speakers, stated when and where the statements were made and explained the reasons why the statements were fraudulent.[110] Plaintiffs have identified one hundred and twenty breaches of the License Agreement, suggesting that the Disney relationship was being mismanaged and in danger of being terminated. By not disclosing these breaches, it is plausible that the Company was attempting to inflate its stock price. Plaintiffs have pled particularized facts sufficient to support an inference that the allegedly omitted facts were material and actually existed at the time of the claimed misstatements.[111] Accordingly, plaintiffs have satisfied the particularity requirements of both Rule 9(b) and the PSLRA.

■ Defendants also assert that the alleged misstatements and omissions are protected by the PSLRA's safe harbor provision and the bespeaks caution doctrine and are immaterial because they are statements of optimism or puffery. Plaintiffs contend that because the Company had no reasonable basis for these positive comments and did not provide sufficient accompanying cautionary language, the statements are beyond mere "puffery."[112] While some of the statements may have been forward-looking, many were not. Moreover, given the large number of breaches, it is certainly plausible that cer-

tain risks had become reality. As a result, any reasonable investor would consider the statements important.[113] Accordingly, the statements are material and are not protected by the bespeaks caution doctrine or the PSLRA's safe harbor provision.[114]

■ Lastly defendants assert that the alleged misstatements are immaterial under the "truth-on-the-market" doctrine. This doctrine represents the assumption that "a misrepresentation is immaterial if the information is already known to the market."[115] While some facts regarding the maintenance of the Disney Stores were known, many were not. Disclosures such as the "ratcheting down" of the Disney Stores remodeling efforts did not fully reveal the numerous breaches of the License Agreement that occurred during 2006–2007. Whether the Disney problems were adequately disclosed to the market is a fact-intensive query that cannot be disposed of on a motion to dismiss.[116] Accordingly, falsity is adequately pled to survive a motion to dismiss.

### a. The Disney Stores Acquisition

■ Following the acquisition of the Disney Stores and during the Class Period, TCP "experienced ongoing problems and delays."[117] According to CW 1, the issues overlapped because problems and delays in store redesigns impacted merchandise development, selection, ordering, and, as a result, sales.[118] Throughout the

---

**109.** See, e.g., Caiafa, 525 F.Supp.2d at 410–11.

**110.** See Novak, 216 F.3d at 306. See also 15 U.S.C. § 78u–4(b)(*l*)(B).

**111.** See In re NTL, 347 F.Supp.2d at 23.

**112.** See In re Vivendi Universal, 381 F.Supp.2d at 182.

**113.** See In re Nortel Networks, 238 F.Supp.2d at 629 (holding that statements not protected where the defendants "had no basis for their optimistic statements and already knew (al-

legedly) that certain risks had become reality"). See also Halperin, 295 F.3d at 357.

**114.** See, e.g., In re Nortel Networks, 238 F.Supp.2d at 629.

**115.** Ganino, 228 F.3d at 167.

**116.** See id.

**117.** Compl. ¶ 15.

**118.** See id.

Class Period, TCP repeatedly made statements concerning the License Agreement and the Disney relationship.[119] With respect to the Disney Stores, Dabah and the Company discussed the Mickey Store format favorably, commenting on the "continued positive trend of the business," the "continued strength," and the "consistent execution of our strategies."[120] Once TCP chose to speak about these issues, it undertook a duty "to speak truthfully and to make such additional disclosures as ... necessary to avoid rendering the statements misleading."[121] Plaintiffs contend that the Company nevertheless concealed information regarding the true extent of the Company's problems. As a result of their failure to meet certain deadlines and other violations of the License Agreement, TCP was "in breach of the License Agreement throughout 2006 and most of 2007."[122] In 2007, Disney notified TCP that it had committed one hundred and twenty breaches of the License Agreement.[123] Despite TCP's positive statements about the retail stores, the Company never fully informed investors about the extent of problems concerning the redesign of stores, merchandise development, selection, or ordering, nor did it disclose the Company's failure to meet Disney's expectations or obligations imposed by the License Agreement.[124] Plaintiffs contend that the Company misled investors to believe that the scheduling delays were caused by mutual dissatisfac-

tion, when in fact Disney was the only dissatisfied party.[125]

Plaintiffs' claim is supported by several alleged facts and reasonable inferences drawn from those facts. As an example, on the first day of the Class Period, March 9, 2006, the Company issued a press release announcing its financial results for the fourth quarter of 2005, reporting net income of $65.6 million.[126] Dabah commented on these results, stating that TCP and the Disney Stores "can grow up to 1,800 stores, leaving us with 700 stores still to open ...,"[127] The Complaint alleges that Dabah's statement about opening 700 more stores was materially false and misleading.[128] The Complaint also alleges that in the press release Dabah and TCP overstated the Company's net income by $5.6 million.[129] Plaintiffs allege that because of the problems the Company was having with Disney, there was no reasonable basis upon which to make these public statements.[130] Given the large number of breaches of the License Agreement, it is as plausible that TCP did provide misleading and false information to the market and to investors.

### b. Stock Option Grants and Financial Statements

 TCP represented to investors that the price of its stock options would be set "at the time of grant" and not less than the fair market value shares as of that date.[131]

119. *See, e.g.,* ¶¶ 80, 86, 99.

120. *Id.* ¶¶ 82, 84, 88, 90.

121. *In re Par Pharm.,* 733 F.Supp. at 675.

122. Compl. ¶ 58.

123. *See id.* ¶ 59.

124. *See id.* ¶¶ 44–45, 52–56.

125. *See id.* ¶ 105.

126. *See id.* ¶ 80.

127. *Id.*

128. *See id.* ¶ 81.

129. *See id.*

130. *See In re Vivendi Universal,* 381 F.Supp.2d at 182.

131. Compl. ¶¶ 65–66.

The Complaint alleges that TCP issued stock options that were spring-loaded.[132] An example of spring-loading occurred on April 29, 2005 when a total of 85,000 TCP stock options were issued to Dabah at the exercise price of $41.42 per share.[133] On May 5, 2005, the Company announced increased earnings per share in its press release, causing its stock to trade at $44.72 per share.[134] The Company admitted, "[i]n many instances options were dated before all grant-making processes were finalized [resulting in an] option exercise price [that] was lower than it should have been based on the trading price on the date the grant process was completed."[135] TCP disclosed in its 2005 Form 10–K that "as a result of the inadequacy of the Company's governance, internal financial reporting and other controls over the option grant process, the APB 25 measurement dates used by the Company for a significant portion of the stock options granted during the Review Period were incorrect . . . ."[136]

Backdating the options had the effect of understating compensation expenses, thereby overstating net income and earnings per share on the Company's financial statements.[137] In violation of GAAP, the Company materially understated its compensation expenses when it failed to expense the in-the-money portion of backdated option grants.[138] Following an SEC investigation, the Company was forced to restate its financial statements for fiscal years 2003–2006.[139] Plaintiffs contend that the Company admitted that the prior publicly disclosed financial statements from those years were materially false.[140] The allegations in the Complaint, taken as a whole and drawing all reasonable inferences in plaintiffs' favor, are adequate at this stage to plead that because the Company's stock options were backdated, its financial statements contained material misrepresentations.

### c. Sarbanes–Oxley Certifications

■ The Sarbanes–Oxley Act of 2002 requires certain officers and the accountants of a public company to execute certifications that are filed with the company's Forms 10–K and 10–Q.[141] These certifications must discuss the company's internal control systems and must explain the effectiveness of those internal controls.[142] The Complaint alleges that Dabah and Riley violated section 10(b) and Rule 10b–5 by providing false Sarbanes–Oxley certifications in connection with the Company's Forms 10–K and Forms 10–Q for the Class Period.[143]

The certifications state that to the best of their knowledge, each Form "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."[144] Thus, for these certifications to be materially false, it is insufficient for the financial

132. *See id.* ¶ 68.

133. *See id.* ¶ 71.

134. *See id.*

135. *Id.* ¶ 101.

136. *Id.* ¶ 69.

137. *See id.* ¶ 72.

138. *See id.* ¶ 70.

139. *See id.* ¶¶ 73, 80–81, 101.

140. *See id.* ¶¶ 73–74.

141. *See* Pub.L. No. 107–204, 116 Stat. 745 (2002).

142. *See* 15 U.S.C. § 7241(a)(4).

143. *See* Compl. ¶¶ 75–78.

144. *Id.* ¶ 78.

statements themselves to have been false—defendants must also have had knowledge of that falsity.[145] Plaintiffs allege that these certifications were false in that Dabah and Riley knew that the Company backdated stock options, thereby overstating its net income.

The certifications also state that Dabah and Riley had implemented internal controls over the company's financial reporting sufficient "to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."[146] Further, they explain that the Forms disclose "all significant deficiencies and material weaknesses in the design or operation" of those internal controls that are "reasonably likely to adversely affect" the financial statements.[147] As discussed above, plaintiffs have alleged sufficient facts to support the inference that Dabah and Riley knew or had access to information showing that stock options had been backdated.

Plaintiffs further claim that the financial statements were materially misleading in that the Company's internal controls were structurally inadequate. The allegations state that because the internal controls were lacking, the Company was able to improperly report compensation expenses.[148] Moreover, plaintiffs allege that Dabah admittedly violated the Company's internal control policies by pledging shares of his common stock as collateral for margin loans in his brokerage account during a

black-out period.[149] Once this information was disclosed, Dabah and the Company's outside auditor, Deloitte & Touche LLP ("Deloitte"), resigned.[150]

### 2. Scienter

■ Although plaintiffs have adequately pled falsity, "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim. Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient."[151] The Complaint alleges that Dabah and Riley's intent to deceive or reckless disregard for the truth is demonstrated by substantial circumstantial evidence supporting a strong inference of scienter.[152] This circumstantial evidence includes testimony from CWs showing that the Company consistently violated the terms of the License Agreement and had knowledge that its positive statements were unwarranted.[153] Defendants argue that the Complaint, including information gathered from the CWs, does not support a strong inference that Dabah and Riley acted with any intent to defraud when it failed to discuss breaches of the License Agreement. In fact, defendants contend that the CWs' allegations give rise to the opposing inference: that the Company did not believe that the problems with Disney were so material as to undermine TCP's business.

"The threshold requirement is that the allegations must satisfy the court that plaintiff's claim is not unwarranted."[154] In

---

145. *See Caiola,* 295 F.3d at 331.

146. Compl. ¶ 78.

147. *Id.*

148. *See id.*

149. *See id.* ¶ 8.

150. *See id.* ¶¶ 131–132.

151. *Novak,* 216 F.3d at 309 (quotations omitted).

152. *See* Compl. ¶¶ 133–137.

153. *See id.* ¶¶ 6, 44, 48–49, 54–56, 62, 108.

154. *In re Scottish Re Group,* 524 F.Supp.2d at 392 (quotations omitted).

the instant case, the allegations of the CWs provide an adequate basis for believing that the Company knew that the problems with Disney were material. The CWs, all of whom claim knowledge of a systemic failure in the Company's management, occupied positions that allowed for relevant hands-on experience in various parts of the Company. Accordingly, it is reasonable to assume that the CWs knew of the Company's failure to meet certain deadlines and of other violations of the License Agreement. Because the CWs' allegations are sufficiently particular to support their plausibility, they provide sufficient support for the inference that Dabah and Riley acted with the requisite scienter. This Complaint, taken as a whole, adequately pleads an inference of scienter as to each of the defendants that is cogent and at least as compelling as any plausible opposing inference.[155]

**a. Dabah**

█ Plaintiffs allege that the following facts, considered collectively as *Tellabs* requires, give rise to an inference of scienter that is at least as likely as any plausible opposing inference: (1) the statements and omissions that the Company made with reckless, if not knowing, disregard for the truth; (2) the admitted backdating scheme; (3) the restatement of the financials; (4) the resignations of Dabah and Deloitte; and (5) the repeated and knowing violations of the Company's internal controls, particularly with respect to Dabah's pledged shares of stock.[156] Dabah's pledge of shares in his personal brokerage account amounted to a "concrete and personal benefit."[157] This pledge provided Dabah with a financial incentive to conceal the problems at the Company in order to avoid a decline in the stock price that could trigger a margin call or a decrease in available credit in his personal brokerage account.[158]

In the wake of the SEC investigation into the backdating of TCP's stock options, the Company admitted that it had material weaknesses in its internal controls—weaknesses probative of scienter.[159] Dabah's forced resignation and Deloitte's resignation "add to the overall pleading of circumstantial evidence of fraud."[160] Defendants have failed to suggest a plausible opposing inference that is more likely than the strong inference of scienter on the part of Dabah.

**b. Riley and the Company**

█ Scienter may be pled "by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater" than with motive allegations.[161] Here, plaintiffs' allegations, taken as true, adequately plead that Riley's conduct was "highly unreasonable" and "an extreme departure from the standards of ordinary care to the extent

---

155. *See Tellabs*, 127 S.Ct. at 2511.

156. *See* Compl. ¶¶ 8, 130.

157. *See Kalnit*, 264 F.3d at 139 ("Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud."). *See also Chemical Bank*, 726 F.2d at 939 (holding that "a pledge is a sale and purchase of a security under § 10(b)").

158. *See* Compl ¶¶ 8, 130.

159. *See In re Veeco Instruments*, 235 F.R.D. at 232 (holding that a "failure to maintain sufficient internal controls to avoid fraud is ... indicative of scienter").

160. *In re Scottish Re Group*, 524 F.Supp.2d at 394 n. 176.

161. *Kalnit*, 264 F.3d at 142.

that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." [162] In short, all of the reasons supporting an inference that the financial statements were false, as discussed above, were known to Riley at the time she made the Sarbanes–Oxley certifications. The Complaint adequately alleges that Riley knew, or was at the very least reckless in not knowing, that the financial statements were based upon incorrect APB 25 measurement dates and faulty internal control processes. Assuming the allegations of the Complaint to be true, a reasonable person would consider the inference that Riley acted with the required scienter to be at least as strong as any opposing inference. [163]

██ With respect to the Company's liability, plaintiffs "must prove that an agent of the corporation committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to the corporation." [164] Plaintiffs have sufficiently alleged that Dabah and Riley, as agents of the corporation, have committed culpable acts with the requisite scienter. Therefore, their acts and accompanying scienter are attributable to TCP.

### 3. Loss Causation[165]

██ All defendants move for dismissal on the ground that plaintiffs have failed to allege a causal connection between the Company's alleged fraud and plaintiffs' losses. Plaintiffs argue that TCP's misrepresentations artificially inflated the value of the stock at the time of purchase. Had the Company revealed its internal control weaknesses, investors could have arrived at a valuation of the securities that more accurately reflected the risk of the Company. Instead, trusting that the Company possessed adequate internal controls, it is plausible that investors believed such financial problems would be discovered without undue delay.

Plaintiffs allege that the price of TCP securities declined in July and August 2007 as the Company revealed undisclosed problems with the Disney Stores. [166] They allege that TCP stock declined thirty percent after these disclosures came to light as a direct result of the revelation to investors of the nature and extent of the Company's fraud. [167] The allegations in the Complaint, taken as a whole and drawing all reasonable inferences in plaintiffs' favor, are adequate to plead that the Company's financial statements were materially misstated and the market was not informed of the nature and extent of TCP's problems. As a result of the false and misleading statements regarding its License Agreement and financial statements, plaintiffs contend that the Company caused its stock to trade at artificially inflated levels throughout the Class Period. A reasonable inference may be drawn from the facts and statements outlined above that disclosing the Company's alleged fraud in July and August of 2007 caused the stock price to fall and resulted in economic loss to the Shareholders.

### B. Control Person Liability

The Complaint alleges control person liability under section 20(a) against Dabah and Riley. Dabah and Riley challenge these claims on the basis that the Complaint fails to allege a primary violation.

---

162. *Id.* (quotation omitted).

163. *See Tellabs,* 127 S.Ct. at 2511.

164. *Teamsters Local,* 531 F.3d 190, 195.

165. Defendants do not challenge transaction causation in this case.

166. *See* Compl ¶ 140.

167. *See id.* ¶ 141.

For the reasons stated above, this challenge fails.

 Defendants assert that the control person claims fail because conclusory assertions of control status are insufficient as a matter of law. To plead control under Rule 8, the allegations in the complaint must meet the standard of "plausibility."[168] Moreover, "[w]hether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss."[169]

Here, the Complaint alleges that Dabah and Riley occupied positions as CEO and CFO respectively and both were directly involved in day-to-day management of the Company and were responsible for statements made to the public.[170] Further, the Complaint alleges that Dabah and Riley were "culpable participants" in the fraud with facts supporting an inference that they not only exerted control over TCP but also participated in the alleged improprieties with scienter.[171] Thus, because the Complaint adequately pleads a primary violation under the Exchange Act, as discussed above, the Complaint states a claim for control person liability as to each of the alleged control persons.

## IV. CONCLUSION

For the reasons discussed above, defendants' motions to dismiss are denied. The Clerk of the Court is directed to close these motions [nos. 22 and 25 on the docket sheet]. A conference is scheduled for July 31, 2008, at 3:30 p.m.

SO ORDERED.

---

**168.** *See Bell Atl.,* 127 S.Ct. at 1970.

**169.** *In re Oxford Health,* 187 F.R.D. at 143.

**170.** *See* Compl. ¶¶ 17–22.

**171.** *See id.*